UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 11-11215-RWZ


UNITED STATES OF AMERICA,
ex rel.
KATHLEEN NORRIS

v.

THE SHAUGHNESSY-KAPLAN
REHABILITATION HOSPITAL, INC.,
d/b/a
SPAULDING REHABILITATION
CENTER FOR CONTINUING
MEDICAL CARE—NORTH SHORE


MEMORANDUM AND ORDER

November 23, 2015


ZOBEL, D.J.

On May 26, 2011, the Shaughnessy-Kaplan Rehabilitation Hospital, Inc, doing

business as the Spaulding Rehabilitation Center for Continuing Medical Care—North

Shore ("Spaulding" or "the hospital"), fired Kathleen Norris. Norris's responsibilities with

Spaulding included managing Medicare compliance. In the course of her work, Norris

grew worried that Spaulding overbilled Medicare for certain patients in violation of the

program's "midnight rule" and occasionally brought these concerns to management.

After her termination, Norris sued Spaulding under the federal False Claims Act

("FCA") for defrauding the federal government and for retaliating against her. The

parties have settled the fraud claims and only Norris's retaliation claim remains.

Spaulding has moved for summary judgment on this claim, arguing that Norris falls

outside the FCA's protections and that, in any event, it fired her for poor performance.

For the reasons that follow, Spaulding's motion is allowed.

## I.    Background

Norris started at Spaulding in October 2007. She worked as the hospital's

Minimum Data Set ("MDS") Coordinator, a position whose duties required her to ensure

Spaulding's compliance with Medicare regulations. Early on, Norris noticed that

Spaulding transferred certain patients to Salem Hospital for evening and nighttime

treatments, and that these patients often did not return to Spaulding before midnight.

Nonetheless, Norris claims, Spaulding billed Medicare for these patients' beds for the

day of transfer in violation of the "midnight rule," a Medicare policy that prohibits billing

for the bed on the day of transfer if the patient does not return before midnight. Norris

discussed this with her supervisor, Laurie Flynn, who reassured Norris that Spaulding

had previously sought guidance on the midnight rule and billed appropriately. Until

Norris again began to draw attention to the midnight rule nearly four years later, she

had one more relevant encounter with Spaulding management. In October of 2010,

Norris received a disciplinary warning, though she contested its findings and Spaulding

later removed it from her permanent record.

Norris revived her concerns in late 2010 and early 2011 and mentioned to Flynn

and Bruce Glass, the administrator of Norris's division, that Spaulding billed Medicare

in violation of the midnight rule. Norris remained alert for potential violations of the

midnight rule, discussing it with several senior staff at Spaulding beginning in January 2011.

On May 1, 2011, the Massachusetts Department of Public Health ("DPH"), Spaulding's state regulator, announced a surprise multi-day visit. Spaulding employees, including Norris, knew that such visits could carry tremendous consequences for the hospital. If DPH officials find Spaulding to be out of compliance with state or federal regulations, DPH may issue a deficiency finding against Spaulding, and these deficiency findings can affect Medicare reimbursement rates.

As Spaulding's MDS Coordinator, Norris's chief role concerning the DPH visit was to ensure that she had completed and submitted MDS assessments for Spaulding patients in a timely fashion. Before the DPH visit, Norris's supervisors learned that she had fallen behind on her MDS assessments; on the second day of the DPH visit, those supervisors admonished her to complete the assessments before DPH examined them. Despite these exhortations, Norris failed to complete the MDS assessments on time, causing DPH to issue a Statement of Deficiencies on May 6, 2011. The Statement of Deficiencies cited only the failure to ensure timely completion of the MDS assessments, which led several Spaulding employees to express concern over Norris's performance and to call for her termination.

On May 12, 2011, Timothy Lynch, Spaulding's Vice President of Hospital Operations, decided to dismiss Norris pending the hiring of a replacement, which he anticipated doing within a week. The email thread discussing Norris's termination, which includes several of Norris's supervisors, mentions only her failure during the

DPS visit to explain the decision. Nowhere does any participant mention Norris's advocacy or investigation concerning the midnight rule. On May 25, Norris sent an email concerning potential violations of the midnight rule to her colleagues. The day after, May 26, Spaulding fired Norris. Spaulding offered her a transition package, but Norris declined, opting instead to leave her post immediately.

Immediately after her termination, Norris sought to "build a rebuttal case" against the hospital, and filed this case on July 11, 2011. On behalf of the government, Norris alleged that Spaulding, by ignoring the Medicare midnight rule, defrauded the federal government and violated the FCA. These claims were settled in 2013. Only a single claim remains: Norris's allegation that her termination ran afoul of the FCA's anti-retaliation provision.

## II.    Standard

Summary judgment issues only when "particular parts of materials in the record" show "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. Thus, Spaulding must first demonstrate, by "materials of evidentiary quality," that no such issue exists. Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). To counter, plaintiff must produce specific facts to demonstrate that reasonable jurors could resolve the disputed point in her favor. Id. "The mere existence of a scintilla of evidence" cannot defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Plaintiff must present "definite, competent evidence to rebut the motion," Torres v. E.I. Dupont Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (internal quotations omitted), and "demonstrate that a

trialworthy issue exists," <u>Mulvihill</u>, 335 F.3d at 19.

## III.   Discussion

The FCA provides that:

> Any employee, contractor, or agent shall be entitled to all
> relief necessary to make that employee, contractor, or agent
> whole, if that employee, contractor, or agent is discharged,
> demoted, suspended, threatened, harassed, or in any other
> manner discriminated against in the terms and conditions of
> employment because of lawful acts done by the employee,
> contractor, agent or associated others in furtherance of an
> action under this section or other efforts to stop 1 or more
> violations of [the FCA].

31 U.S.C. § 3730(h)(1) (2012) ("Section h"). Congress amended Section h through the

Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617

("FERA"). FERA amended Section h in two ways: first, it removed the word "employer"

from the description of the potential defendants and created rights of action for "any

employee, contractor, or agent." <u>Compare</u> 31 U.S.C. § 3730(h) (1986) <u>with</u> 31 U.S.C. §

3730(h)(1) (2009). Second, FERA broadened the definition of protected activity from

"lawful acts . . . in furtherance of an [FCA] action," to "lawful acts . . . in furtherance of

an [FCA] action . . . or other efforts to stop 1 or more violations of [the FCA]." <u>Compare</u>

31 U.S.C. § 3730(h) (1986) <u>with</u> 31 U.S.C. § 3730(h)(1) (2009).

To succeed on a Section h claim requires plaintiff to show (1) that she engaged

in conduct protected by the FCA, (2) that the defendant knew that she engaged in

protected conduct, and (3) that the defendant retaliated against her because of that

protected conduct. <u>See, e.g.</u>, <u>Maturi v. McLaughlin Research Corp.</u>, 413 F.3d 166, 172

(1st Cir. 2005). Because Norris has produced no "definite, competent evidence,"

5

Torres, 219 F.3d at 18, that Spaulding fired her for protected conduct, I need not decide the first two prerequisites and assume plaintiff has, in fact, additional evidence sufficient to show plaintiff's protected conduct and defendant's knowledge thereof.

To determine the third issue, whether a defendant has retaliated against a Section h plaintiff "because of" her protected activity, courts apply the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). That framework has three phases. First, the plaintiff must make out a prima facie case of retaliation. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49–50 (2003) (citing McDonnell Douglas, 411 U.S. at 802). "[M]ere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" suffices to establish a prima facie case of retaliation. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). In the First Circuit, termination must follow within roughly three months for temporal proximity alone to establish causation. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Once the plaintiff has established her prima facie case, the burden of production shifts to the defendant, who must articulate a legitimate justification for the challenged action. Raytheon, 540 U.S. at 49–50. If the defendant satisfies this burden, the plaintiff must then demonstrate that the proffered explanation is pretextual or otherwise false. Id. at 52.

Assuming both that Norris engaged in protected activity by calling attention to Spaulding's violation of the midnight rule, and that Spaulding knew of this activity, she has made out her prima facia case for retaliation. The record shows that Norris had

several discussions concerning the midnight rule with colleagues and superiors in the early months of 2011, and that Spaulding's management knew of her concerns by March of 2011. Two months and some weeks later, on May 12, 2011, Spaulding decided to fire Norris, and it notified her of the decision on May 26. Viewed "in the light most hospitable to the party opposing summary judgment," Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990), these facts support an inference of retaliation based solely on temporal proximity.

Against this prima facie case, Spaulding has offered a plausible alternative hypothesis—that it fired Norris for her poor performance. The record shows, and the parties do not dispute, that Spaulding's state regulator issued a deficiency finding against the hospital on May 6, 2011 based, in whole or in part, on Norris's failure to complete certain duties of her position during an audit earlier that month. Six days later, on May 12, Spaulding had decided to terminate Norris pending the hiring of a replacement in an email that references Norris's unsatisfactory performance during the audit. The speed with which this email followed the deficiency finding—four business days—lends additional credence to Spaulding's version of events.

Norris has produced absolutely no evidence to suggest that defendant's stated versions are pretextual. Norris's entire[1] pretext argument rests on a paperwork discrepancy concerning her termination. Spaulding informed Norris that it had fired her

---

[1] Norris argues that Spaulding dismissed her on May 26, 2011, just hours after she sent an email concerning the midnight rule, and claims that this extraordinary proximity demonstrates the falsity of any competing explanation. This argument has no factual basis: Spaulding decided to terminate Norris on May 12, 2011.

given her inability to meet performance expectations, though certain Spaulding records list "Job Abandonment" as the reason for Norris's termination. This discrepancy results from the simple fact that Norris opted to leave Spaulding immediately upon learning of her termination in lieu of accepting the transition package offered by Spaulding. Spaulding records citing "Job Abandonment" thus reflect a decision made by Norris, not an effort to conceal retaliatory motives. Norris likewise offers no evidence of hostility or unfairness towards her that Spaulding sought to mask with a story of poor performance. Indeed, Spaulding allowed Norris to contest a 2010 disciplinary action and later purged it from her permanent file. The record simply does not permit an inference that Spaulding fired Norris out of retaliatory animus that it has since buried beneath complaints about her work.

## IV.   Conclusion

Defendant Spaulding's Motion for Summary Judgment (Docket # 57) is ALLOWED. Judgment may be entered for the defendant.


      November 23, 2015                              /s/Rya W. Zobel

            DATE                                       RYA W. ZOBEL
                                              UNITED STATES DISTRICT JUDGE